BESSIE LEATHERMAN v. FLOYD HERMAN LEATHERMAN AND LEATHER-
MAN, INC.

No. 27

(Filed 30 July 1979)

1. **Trusts § 13.4— wife's services in husband's business—use of joint bank ac-
count funds to capitalize corporation—no resulting trust in stock**
    Plaintiff was not entitled to a resulting trust in one-half of the stock of a
    corporation formed upon incorporation of her husband's land clearing business
    because she had performed bookkeeping and other supportive services for the
    husband's business for many years, the income from the business was placed
    in joint bank accounts, and money in the joint bank accounts was used to
    capitalize the corporation where plaintiff failed to overcome the presumption
    that services rendered by a wife in her husband's business are gratuitously
    performed absent a special agreement to the contrary; the evidence showed
    that the funds in the joint account were the exclusive property of the husband,
    and plaintiff failed to show that her husband, by depositing funds in a joint ac-
    count, intended to make her an *inter vivos* gift of such funds; and plaintiff thus
    failed to show that she had an ownership interest in the bank accounts.

2. **Trusts § 14.2— wife's services in husband's business—use of joint account
funds to capitalize corporation—no constructive trust in stock**
    Plaintiff wife was not entitled to have a constructive trust imposed on
    one-half of the stock of a corporation formed upon incorporation of her husband's business and capitalized with funds derived from the business which
    had been placed in joint bank accounts of plaintiff wife and defendant husband,
    although the wife had contributed her services to the building up of the
    business, since (1) defendant husband did not acquire any property through the
    use of funds to which plaintiff wife had an equitable or legal claim, and (2) even
    though there was a confidential relationship between the parties, there was no
    evidence that defendant failed to disclose any material fact with respect to the
    use of the funds to capitalize the corporation or that defendant violated any
    duty to plaintiff.

    Justice BROCK did not participate in the consideration or decision of this
case.

    Chief Justice SHARP dissenting.

    Justice HUSKINS joins in the dissent.

APPEAL by plaintiff pursuant to G.S. 7A-30(2) from the deci-
sion of the Court of Appeals, 38 N.C. App. 696, 248 S.E. 2d 764
(1978) reversing judgment entered by *Lewis, J.,* 11 July 1977, in
CATAWBA Superior Court, *Judge Robert M. Martin* dissenting.

Leatherman v. Leatherman

Plaintiff filed a complaint in this action on 31 October 1975 in which she alleged that she was entitled to be declared the owner of one-half of the capital stock of defendant corporation, Leatherman, Inc., held by defendant Floyd Leatherman (hereinafter referred to as defendant). Defendants filed a joint answer in which they denied the material allegations of the complaint. Defendants also averred that plaintiff lacked any ownership interest in the sole proprietorship from which the corporation was formed and that plaintiff lacked any ownership interest in the joint bank accounts from which funds were taken to capitalize the corporation.

Jury trial was waived and evidence offered at trial tended to show:

Plaintiff and defendant were married 17 August 1947 and obtained a divorce in May 1975. During the marriage three children were born to the couple. At the time of the separation defendant conveyed to plaintiff a house and ten acres of land clear of all liens. He also paid her a lump sum of $5,000.00 and agreed to pay her $500.00 monthly until her death or remarriage. The agreement stated that its provisions were not to affect this claim relating to the stock of the corporation.

In 1951 defendant bought a bulldozer from his father and began doing custom grading work. He was the sole operator of the bulldozer and did all the work on the various jobs for which he was hired. Plaintiff kept the books, answered the phone, paid the bills, and did other supportive work for the business. The income from the business was placed in a joint bank account to which both husband and wife made deposits. Plaintiff testified that all monies deposited to this account were derived from the grading business. Neither of them received a salary from this account, but funds from it were used to pay household and business expenses.

About 1960 the business began to expand, branching out to larger contract jobs, buying new equipment, and hiring additional personnel. As a consequence of this growth, plaintiff spent more time doing the support work of the business. By 1963 the company had begun doing out-of-state work, had hired twenty-eight employees, and had accumulated several more pieces of equipment. Between 1963 and 1965 plaintiff worked full time (forty hours or more weekly) in the business office maintained in the

couple's home. During this time neither plaintiff nor defendant was paid a salary. Both business and household funds continued to be channeled through the joint checking account. During this time the couple also placed some money in joint savings accounts.

In 1965 the sole proprietorship was incorporated as Leatherman, Inc. $32,382.02 was transferred from the joint checking and savings accounts to accounts in the name of the corporation. All of the equipment which the business had acquired was likewise transferred to the corporation. Plaintiff aided the accountants who did the financial work for the new corporation. Her duties continued to require her full time. The corporation's net worth was approximately $93,000.00 and all of its 930 shares were issued to defendant. Plaintiff protested this arrangement and her husband and the accountants explained that this was necessary for "tax purposes." Defendant also told her that she was "going to get it [the business] anyway" as they would execute cross-wills to each other. These wills were executed shortly thereafter.

After the corporation was formed plaintiff continued to do the office work required to support the business and defendant continued to do the on-the-job supervision of the grading. The office duties increased when the firm began to submit competitive bids to acquire contract work. In 1966 defendant was paid a salary of $20,000.00. From this salary the household expenditures were made. It was explained to plaintiff that this compensation was for both of them and was paid in this manner to reduce the amount of taxes and social security which were withheld. After she protested, plaintiff was paid a salary for the first time in 1971. She continued to receive a salary until she left the employ of the corporation in 1974.

From 1951 until 1965 all financing for the business was arranged through loans cosigned by both plaintiff and defendant. After 1965 financing for the corporation was obtained through similar loans to the couple who in turn lent funds to the corporation. Purchases of equipment were handled similarly with both the husband and the wife signing the required financing documents.

Defendant never told plaintiff that any of the company's stock would be transferred to her. After they separated she asked him to compensate her for the work she had done in the

business by transferring some of its stock to her. He refused and this action was begun.

On 11 July 1977 judgment *nunc pro tunc* was entered. The court found, among other things, that plaintiff owned a one-half interest in the joint accounts which were used to capitalize the corporation. The court imposed a constructive trust in the amount of $16,191.01 upon defendant's stock holdings in defendant corporation. Defendants excepted to various findings of fact made by the court, to the imposition of a constructive trust upon the stock, and to the entry of judgment based on said findings of fact and conclusions of law.

*Rudisill & Brackett, by J. Steven Brackett, for plaintiff-appellant.*

*Patton, Starnes & Thompson, by Thomas M. Starnes, for defendant-appellees.*

BRITT, Justice.

Plaintiff contends the Court of Appeals erred in failing to uphold the constructive trust imposed by the trial court on the stock holdings of defendant in the corporation. In its decision the Court of Appeals held that plaintiff had failed to show from the facts and circumstances that a "special contract" existed between herself and defendant which entitled her to compensation for work performed for the business; therefore, her claim of legal ownership in the stock could not be maintained. The Court of Appeals held that plaintiff had failed to show any wrongdoing on the part of defendant which justified the imposition of a constructive trust. The decision of the Court of Appeals is well reasoned and is based upon sound legal principles. It is therefore affirmed.

[1] Two classes of trusts arise by operation of law; resulting trusts and constructive trusts. *Bowen v. Darden,* 241 N.C. 11, 84 S.E. 2d 289 (1954); *Teachey v. Gurley,* 214 N.C. 288, 199 S.E. 83 (1938). "[T]he creation of a resulting trust involves the application of the doctrine that valuable consideration rather than legal title determines the equitable title resulting from a transaction; whereas a constuctive trust ordinarily arises out of the existence of fraud, actual or presumptive — usually involving the violation of a confidential or fiduciary relation — in view of which equity

transfers the beneficial title to some person other than the holder of the legal title." Bowen, *supra* at pages 13-14. Before either type of trust can be imposed by the court, it must be shown that the party seeking to invoke these doctrines has been deprived of the beneficial interest to which he is entitled in some property. The elementary flaw in plaintiff's case for a resulting trust is her failure to prove that she owned a portion of the funds in the joint accounts. Absent an enforceable interest in those funds, she cannot have an equitable interest in the stock purchased therewith.

The trial court found "[t]hat the funds transferred from joint accounts to the corporate account in 1966 were the property of the plaintiff and defendant, either of whom could have withdrawn any or all of the funds at any time." Although denominated a finding of fact, this is actually a mixed question of law and fact which may be reviewed on appeal. *Carolina-Virginia Fashion Exhibitors, Inc. v. Gunter*, 291 N.C. 208, 230 S.E. 2d 380 (1976); *Davison v. Duke University*, 282 N.C. 676, 194 S.E. 2d 761 (1973). We do not believe that the trial court correctly applied the law to the facts shown at the trial of this case. Plaintiff has not overcome the presumption that services rendered by a wife in her husband's business are gratuitously performed absent a special agreement to the contrary. *Smith v. Smith*, 255 N.C. 152, 120 S.E. 2d 575 (1961); *Sprinkle v. Ponder*, 233 N.C. 312, 64 S.E. 2d 171 (1951); *Dorsett v. Dorsett*, 183 N.C. 354, 111 S.E. 541 (1922). Nor has plaintiff sustained the burden of proving that her husband, by depositing funds to an account in the name of himself and his wife, intended to make her an *inter vivos* gift of such funds. Smith, *supra.*

"A wife in North Carolina may recover from her husband, on the basis of an express contract, for services rendered him in connection with his business or outside of the purely domestic relations of the marital status. The status, or marriage, nothing else appearing, negatives an implied promise on the part of the husband to do so." 2 R. Lee, North Carolina Family Law § 110, p. 43 (1963). In this case there is no evidence of an express contract providing that plaintiff be compensated for her work in her husband's business.

The facts and circumstances of a particular case may, of course, give rise to an implied promise that the wife will be paid.

Smith, *supra;* Sprinkle, *supra; Eggleston v. Eggleston*, 228 N.C. 668, 47 S.E. 2d 243 (1948); *Carlisle v. Carlisle*, 225 N.C. 462, 35 S.E. 2d 418 (1945); Dorsett, *supra.* In *Dorsett*, plaintiff and her husband maintained a shop in Greensboro where bicycles, locks, guns and keys were repaired. The wife brought an action in *quantum meruit* to recover pay for services rendered in the defendant's shop. Chief Justice Clark, writing for the court, reasoned:

> "There are instances where there is not only a matrimonial partnership between a husband and wife, but a financial or business partnership; also, where the wife is to receive compensation from her husband for services rendered, but in all such cases the business partnership, or the liability of the husband to the wife for compensation, must arise out of an agreement, not out of the marital relation. . . ." Dorsett, *supra* at page 358.

The court in *Dorsett* sustained defendant's demurrer to the complaint because plaintiff had failed to allege an agreement, understanding, or intention — express or implied — that she was to be compensated for her work. Likewise, plaintiff in the case before us has not alleged an agreement for compensation between herself and defendant. Nor does the evidence reveal that either an explicit or implicit agreement for plaintiff's compensation existed between the parties.

The evidence in this case is unlike that in *Eggleston v. Eggleston, supra,* where plaintiff wife was granted a new trial after this court determined that evidence of a partnership between her and her husband, the defendant, had been improperly excluded. Much like the parties in this case, the Egglestons — through their joint efforts — developed a thriving commercial enterprise from a small family business which began with a single gas station. Mrs. Eggleston testified that she operated the filling station and maintained its books. Her duties in the business were, in short, very similar to those which plaintiff performed for the grading business in this case. The feature which distinguishes *Eggleston* from the case before us, however, is that in that case the husband and wife filed partnership income tax returns on which they listed themselves as partners. This fact is evidence from which the jury could infer that there was an implied agreement or con-

tract between the parties providing for the wife's compensation. No similar circumstance is shown in this case. There is simply no evidence from which the trial court could find an agreement to pay for plaintiff's services. Quite properly, the court did not find that such an agreement existed.

The evidence is also insufficient to sustain the finding of co-ownership of the accounts on the theory that both plaintiff and defendant exercised control over the funds deposited therein.

Under the laws in this jurisdiction, nothing else appearing, money in the bank to the joint credit of husband and wife belongs one-half to the husband and one-half to the wife. *Bowling v. Bowling*, 243 N.C. 515, 519, 91 S.E. 2d 176; *Smith v. Smith*, 190 N.C. 764, 767, 130 S.E. 614; *Turlington v. Lucas*, 186 N.C. 283, 290, 119 S.E. 366.

But in the absence of evidence to the contrary the person making a deposit in a bank is deemed to be the owner of the fund. If a husband deposits his own money in a bank and the money is entered upon the records of the bank in the name of the husband or his wife, it is still the property of the husband, nothing else appearing. *Hall v. Hall*, 235 N.C. 711, 714, 71 S.E. 2d 471; *Nannie v. Pollard*, 205 N.C. 362, 171 S.E. 341; *Jones v. Fullbright*, 197 N.C. 274, 277, 148 S.E. 229; *Thomas v. Houston*, 181 N.C. 91, 93, 106 S.E. 466.

Such deposit does not constitute a gift to the wife. To make a gift *inter vivos* there must be an intention to give coupled with a delivery of, and loss of dominion over, the property given, on the part of the donor. Donor must divest himself of all right and title to, and control of, the gift. Such gift cannot be made to take place in the future. The transaction must show a completely executed transfer to the donee of the present right to the property and the possession. *Buffaloe v. Barnes*, 226 N.C. 313, 318, 38 S.E. 2d 222; *Nannie v. Pollard, supra; Thomas v. Houston, supra.* When a husband deposits his money in the name of husband or wife, this fact taken alone does not necessarily indicate an intent to make a gift to the wife. It may, indeed, be only for the convenience of the husband. Furthermore, he does not thereby divest himself of dominion over the fund. He may withdraw any or all of it at any time. "The delivery of the deposit book for

such an account is not sufficient to meet the formal re-
quirements for a gift." 14 N.C. Law Rev. 133, and cases there
cited (N. 23).

When a husband deposits his money in this manner he
merely constitutes the wife his agent with authority to
withdraw funds from the account, and the agency is ter-
minated by death of the husband. (See cases cited in the sec-
ond paragraph next above.) The agency may be terminated
during the lives of husband and wife by withdrawal of the
fund and closing the account by the husband, notice to the
agent and the bank, or by other methods recognized by law
for termination of the principal and agent relation. Annota-
tion, 161 A.L.R., Joint Deposit—Powers as to, pp. 71-95;
Zollmann Banks and Banking (Perm. Ed.), Vol. 5, s. 3231, p.
250; *Cashman v. Mason*, 72 F. Supp. 487, 491.

Smith, *supra* at pages 154-155.

Plaintiff testified that she did not deposit any of her personal
funds in the joint accounts and that all of the "money that went
into those accounts was money that was earned on grading jobs
by Floyd Leatherman either personally or through his
employees." This testimony makes it clear that the funds in the
joint accounts were the exclusive property of defendant. Both
husband and wife had the authority to deposit and withdraw
money from the accounts. The evidence of both parties tends to
show that plaintiff acted as the agent of her husband, not the
owner, with regard to these funds. Nowhere in the record is there
evidence which would sustain a finding that defendant intended
to make a gift of his property to his wife. On the facts presented
the court could not properly find that plaintiff was a co-owner of
the joint accounts.

Absent an ownership interest in the joint checking and sav-
ings accounts, plaintiff is clearly not entitled to have a resulting
trust imposed upon defendant's stock holdings in the corporation.
A resulting trust arises, if at all, when valuable consideration is
given by one party for property but title thereto is put in the
name of another. *Fulp v. Fulp*, 264 N.C. 20, 140 S.E. 2d 708 (1965);
Bowen, *supra;* D. Dobbs, *Remedies* § 4.3, p. 241 (1973). In the
present case plaintiff did not furnish any of the consideration

used by defendant to acquire the stock on which plaintiff seeks to have her claim imposed. Granting a resulting trust would therefore be improper.

[2]   Plaintiff further contends, however, that a constructive trust may be imposed upon the stock in her favor even though it be determined that she had no ownership interest in the funds in the joint accounts. Her argument is that defendant will be unjustly enriched if he is allowed to retain the stock acquired in violation of the confidential marital relationship with funds which were the product of the joint efforts of the couple. This argument cannot sustain the imposition of a constructive trust in this case.

Ordinarily, a constructive trust arises where "a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." R. Lee, *Trusts* § 13a, p. 67 (7th ed. 1978). Plaintiff's argument overlooks the fact that no unjust enrichment can inure to defendant in this case because he has not acquired any property through the use of funds to which she has an equitable or legal claim.

Assuming that defendant was enriched unjustly, however, plaintiff's case would still fail as she has not shown that defendant violated any duty to her. There must be some actual or presumptive fraud, some breach of duty, or other wrongdoing before a constructive trust can be imposed. *Wilson v. Development Co.*, 276 N.C. 198, 171 S.E. 2d 873 (1970); Fulp, *supra;* Bowen, *supra;* Teachey, *supra.* We are fully cognizant of the fact that "[t]he relationship between husband and wife is the most confidential of all relationships, and transactions between them, to be valid, must be fair and reasonable." *Eubanks v. Eubanks*, 273 N.C. 189, 159 S.E. 2d 562 (1968); *see also: Link v. Link,* 278 N.C. 181, 179 S.E. 2d 697 (1971); *Vail v. Vail,* 233 N.C. 109, 63 S.E. 2d 202 (1951). Where such a confidential relation exists, the person in whom the confidence is reposed must exercise good faith in his dealings with the other party. He must not take advantage of the fiduciary relation between them to obtain profit for himself, and he must fully apprise the other of all material facts surrounding the transactions between them. We believe that defendant fulfilled the obligation to his wife in this case.

As the Court of Appeals noted, the evidence discloses that defendant explained the process of incorporation to his wife and discussed with her the issuance of the stock in the corporation in his name. Nor can any wrongdoing on his part be implied from the execution of cross-wills by the parties subsequent to the issuance of the stock. In so doing defendant did not acknowledge an interest on the part of his wife in the business, but rather, he acknowledged that she was at that time the natural object of his bounty. The court made no other findings of fact which tend to support an inference of malfeasance on the part of defendant with regard to the confidential relationship between himself and his wife. Absent any breach of duty to her, plaintiff is not entitled to have the court impose a constructive trust upon defendant's stock in the corporation.

For the reasons stated the decision of the Court of Appeals is

Affirmed.

Justice BROCK did not participate in the consideration or decision of this case.

Chief Justice SHARP dissenting.

In brief summary, the material facts in this case are the following:

Plaintiff-wife and defendant-husband were married on 17 August 1947. At that time he was "hauling lumber" and she was working at Carolina Mills in Newton. She continued to work at the mill until July 1950, about three months before their first child was born. At that time the parties had saved no money and "did good to live." In 1956 a second child was born; the third came in 1958.

In 1951 defendant bought a bulldozer from his father and for nearly ten years, with plaintiff's help, defendant operated a one-man, one-machine grading business under the name of Leatherman Clearing and Grading. In 1959, for the first time, the business hired outside help. By 1960 it also owned a scraper, employed from four to six men, and rented additional equipment. Beginning in 1963 the business increased steadily and more jobs

required additional equipment. After "joint discussion" the parties purchased the necessary equipment. She and defendant both signed every purchase contract and the security instrument, and each piece of equipment was paid for with a check which plaintiff wrote on the parties' joint bank account. When a performance bond was required plaintiff also signed it along with defendant. They filed a joint federal tax return which included the business. No separate business return of any kind was filed.

From the beginning plaintiff handled the money and did the bookwork. She made deposits, paid the bills, answered the telephone, kept up with defendant's whereabouts on the various jobs, and kept in touch with callers. All money from the business, which was the parties' sole source of income, was deposited in one checking account in the names of "Mr. or Mrs. Floyd Leatherman." Neither took a salary but all bills, business and personal, were paid from this account. Plaintiff testified that "the business came first"; that other money was used only for "the necessary things because we were struggling to build this business."

In 1963 the business employed 28 men and had begun to do work out of the State. In consequence of the increased payroll and other expenses, quarterly reports, "federal forms," individual work sheets, tax record-keeping, etc., plaintiff was then working more than 40 hours a week and continued to do so during 1964 and 1965. When defendant was working out of town plaintiff's responsibilities were increased. The job foreman reported to her every afternoon, and she took care of various problems, including those caused by broken machinery. On occasion, she would take parts and payroll to defendant on jobs in South Carolina.

The headquarters of the business were at the parties' residence, where they used the kitchen and a corner of the bedroom as an office. This arrangement continued until 1964 when they built a new home which included an office with appropriate facilities on the main floor. In addition to her business duties plaintiff did her own housekeeping, took care of the children, and cooked the meals. At no time did she have any household help. In 1963 two of the parties' children were in school; the youngest, about 5 years old, was at home.

In 1965 the parties were still using the same joint checking account from which all personal and business bills were paid, and neither received a salary. At that time the business had grown to such an extent that plaintiff sought the advice of A. M. Pullen Company, certified public accountants, "about a change in the organization of the business." As a result the business was incorporated in January 1966, and the money in the parties' joint checking and savings accounts, $32,382.02, was transferred to the corporation. This money and the equipment which the business of Leatherman Clearing and Grading had purchased from time to time constituted "the capitalization of the corporation." When defendant informed plaintiff he had put all the stock in his name she said, "Well, why?" His reply was that "it would be better this way for tax purposes." Plaintiff could not understand this explanation and was not satisfied by it. When she continued to protest, defendant said, "Well, look, after all you are going to get it anyway. We will make out a will and leave it to you." Thereafter the parties made joint wills in which the survivor took all, and an entry was made on the corporate minutes that in the event of his death plaintiff was to receive his salary until the estate was settled.

According to plaintiff, the net worth of "the going business" at the time of the incorporation was $93,000.00. After the incorporation plaintiff, along with defendant, continued to sign personally the performance bonds and notes of the corporation. Their practice was to borrow the money from the bank and then lend it to the corporation. In 1972 the parties bought a house in Wilmington to be used as a dormitory for their employees working in that area, and the title to this property was taken in their joint names.

Although plaintiff continued to manage the office and "handle the financing" until 1971 only defendant drew a salary from the corporation. He explained to her that the $20,000.00 he drew from 1966 to 1970 represented "joint compensation for both of us"; that the corporation was paying only one salary in order "to cut down on taxes—to save social security and other withholdings." When she inquired what she would do for social security in her old age, he said, "You can always draw on Floyd's." In 1971, however, she insisted that she too be put on a salary and defendant agreed to it.

About 1972 the parties "had some domestic problems" and in January 1974 they separated. She said when defendant told her sometime in 1975 that she would not get anything from the business, "That was my first true realization that I was not going to realize any of the ownership in Leatherman, Inc."

Defendant testified that plaintiff had never demanded payment for any services she rendered the business; that all the money from the business was either put in joint checking or savings accounts; and that she "was not restricted as to using those funds for her own personal purposes if she so desired." He also testified that plaintiff never claimed any part of the money in the joint accounts which were transferred to the corporation, but "she complained about the manner in which the stock was issued from the time it was issued, and from then on."

Throughout his testimony defendant insisted that all the money in the joint accounts was his because he "did the work in the sense that [he] set out on the back of the tractor in the sun and did the grading work." He conceded, however, that from the beginning plaintiff did all "the office work—taking care of the bills, bookwork, and that sort of thing"—and that, at the same time, she took care of the home and the three children. On cross-examination defendant said that in 1965 the business was grossing half a million dollars and he "was running that with a one-woman office staff, and Bessie Leatherman was doing all of the work for the business in the office." With reference to salaries after the incorporation defendant testified, "From 1966 to 1970 my individual salary from the business was $20,000. The agreement between Mrs. Leatherman and me . . . was it was salary for both of us. . . . It was my understanding that the $20,000 was for the work both of us did in the business." In 1971 he told her to put herself on the payroll and she did.

After the parties separated they entered into a separation agreement which provided that the consideration in the Separation Agreement was without prejudice to plaintiff's claim to a part of the stock in Leatherman, Inc. The parties were divorced on 20 May 1975 and plaintiff brought this action on 31 October 1975 for a judgment declaring her to be the owner of one-half of the capital stock of Leatherman, Inc.

Leatherman v. Leatherman

Judge Lewis heard the case without a jury. At the conclusion of the evidence he found the facts to be substantially as testified to by both plaintiff and defendant. In brief summary he specifically found the following pertinent facts (enumeration ours):

1. From the inception of "the bulldozer business" until 1966 (when the business was incorporated) the earnings of the business were allowed to accumulate in the joint personal checking account of the plaintiff and defendant—the only checking account either maintained. Plaintiff drew no salary from the business. [All the evidence tends to show that neither plaintiff nor defendant drew any salary.] Between 1966 and 1971 there was an understanding between the plaintiff and defendant that the "salary paid by the corporation to the defendant was for the work of both the plaintiff and defendant."

2. From its inception "until 1970 plaintiff was the sole office staff for the business operated by the plaintiff and the defendant"; that in 1965 the business generated gross income of about $500,000.00 and continued to grow through 1970 "during which time plaintiff remained the sole office staff."

3. From its inception plaintiff "frequently exercised partial managerial control of the business in the Catawba County area while the defendant was handling out-of-State business. . . ."

4. When the business was incorporated in December 1965 and all of its stock, 930 shares, were issued to defendant, its net worth was approximately $94,000.00.

In January and February 1966 funds totaling $32,382.02 were transferred from the joint checking and savings account of plaintiff and defendant to the corporation. These funds "were the property of the plaintiff and defendant, either of whom could have withdrawn any or all of the funds at any time." These funds represented about one-third of the net assets of the corporation.

5. That at the time all of the stock of the corporation was issued to defendant and the funds in the joint account transferred to the corporation, defendant told plaintiff that the reason for this was the auditor's feeling that "it was more appropriate from a tax point of view to have the stock so titled"; that she would get it all anyway eventually; and that both then made a will cross-conveying to the other all of their individual property.

6. There existed in January 1966 a confidential and fiduciary relationship between the plaintiff and defendant arising out of their marriage.

7. After the business was incorporated plaintiff continued to take care of the office affairs of the corporation but drew no salary and the expenses of the marriage were paid out of the salary of the corporation paid the defendant.

8. Plaintiff and defendant separated on 4 January 1974 and were divorced on 20 May 1975. When plaintiff told defendant she ought to be compensated for her ownership in the business and paid for what she had done, defendant refused and this action was commenced.

Upon the foregoing findings the court concluded that defendant holds title to the 930 outstanding shares of stock in Leatherman, Inc., but that he holds the stock subject to a constructive trust in the amount of $16,191.01 in favor of the plaintiff. He entered judgment accordingly and defendant appealed to the Court of Appeals. Plaintiff did not appeal.

The Court of Appeals held that (1) plaintiff had failed to overcome the presumption that her services to her husband's business were rendered gratuitously and that there was no showing that defendant intended to make a gift to his wife of the funds derived from his business which he placed in the joint accounts; (2) that there was no showing of any wrongdoing on defendant's part; and (3) that therefore the trial court erred in imposing a constructive trust on the stock of the business corporation which had been capitalized with funds from the joint accounts. This Court affirms.

From the majority's decision and the rationale which produced it, I dissent. In my view, the trial judge's findings of fact are supported by all the evidence in the case and the majority decision cannot be supported either by the evidence or the authorities cited therein.

As I read the Court's opinion the majority reasons as follows:

1. Before the Court can impose a trust upon the stock in Leatherman, Inc., to which defendant holds the legal title, plaintiff must prove she owned a portion of the funds in the plaintiff's

and defendant's joint checking and savings accounts which were transferred to the corporation.

2. Services rendered by a wife in connection with a business in which her husband is engaged are all presumed to be gratuitous "absent a special agreement to the contrary." Plaintiff has neither alleged nor proved a special agreement for compensation for services performed. Nor has she proved a gift from her husband of any funds deposited in the joint account.

3. "The facts and circumstances may, of course, give rise to an implied promise that the wife will be paid," but the evidence in this case reveals neither.

4. Defendant did not breach the confidential relationship existing between himself and his wife when he had all the stock in the corporation issued to himself alone because he told her at the time he had done so.

As I see this controversy the majority of the Court of Appeals and this Court have misconstrued plaintiff's pleadings and the theory of her case. She did not bring this suit upon the theory of *quantum meruit* for wages withheld for "supportive work." It is quite true that she neither alleged nor attempted to prove that her husband promised to pay her wages or a salary for the more than 20 years she worked with him in the "bulldozer business." On the contrary, she brought this action upon the theory that she was a full partner with her husband in the business at the time of the incorporation; that her labors in behalf of the business had helped produce the funds which provided the corporate capital and entitled her to half the capital stock. It is quite clear that under our present rules of civil procedure the complaint is adequate to support this theory. G.S.1A-1, Rule 8(a); *Sutton v. Duke*, 277 N.C. 94, 176 S.E. 2d 161 (1970); *Roberts v. Reynolds*, 281 N.C. 48, 187 S.E. 2d 721 (1972).

Decisions of this Court have long recognized that "[t]here are instances where there is not only a matrimonial partnership between a husband and wife, but a financial or business partnership; . . . but in all such cases the business partnership . . . must arise out of an agreement, not out of the marital relation, *ex jure marito*, which if extended to business matters, would make each responsible for the debts of the other." *Dorsett v. Dorsett*, 183

N.C. 354, 358, 111 S.E. 541, 543 (1922). In *Eggleston v. Eggleston,* 228 N.C. 668, 47 S.E. 2d 243 (1948), a case strikingly similar to this one, the plaintiff-wife sought to show the existence of a partnership between herself and her husband by evidence of dealings *inter partes* for a long period of time (15 years) and her contributions in services to the joint undertaking. In reviewing the law with reference to interspousal partnerships, this Court said:

" 'A contract, express or implied, is essential to the formation of a partnership.' . . . But we see no reason why a course of dealing. between the parties of sufficient significance and duration may not, along with other proof of the fact, be admitted as evidence tending to establish the fact of partnership provided it has sufficient substance and definiteness to evince the essentials of the legal concept, including, of course, the necessary intent. . . . 'Partnership is a legal concept but the determination of the existence or not of a partnership, as in the case of a trust, involves inferences drawn from an analysis of all the circumstances attendant on its creation and operation.'

"Not only may a partnership be formed orally, but 'it may be created by the agreement or conduct of the parties, either express or implied.' . . . 'A voluntary association of partners may be shown without proving an express agreement to form a partnership; and a finding of its existence may be based upon a rational consideration of the acts and declarations of the parties, warranting the inference that the parties understood that they were partners and acted as such.' " (Citations omitted.) *Id.* at 674, 47 S.E. 2d at 247.

Certainly plaintiff and defendant neither orally nor in writing entered into a formal partnership agreement. However, the course of dealing between them from 1951 until the business was incorporated in 1969 was consistent only with a business partnership, and their conduct for several years thereafter corroborated its existence. The law does not contemplate that a husband and wife living together in harmony, struggling to rear three children and to get ahead in business, will deal at arms length and speak in formal terms. It looks at their conduct to divine their intent.

Looking at their conduct, we see that plaintiff's "supportive work" was not just occasional help. From the inception of the business she did all the office work, many outside chores, and

handled the money. During the last ten years before the parties separated she worked in the office more than 40 hours a week and acted as manager in her husband's absence from the local job in addition to doing her kitchen and household work and caring for her children. Under these circumstances it is hard to understand the majority's view that "plaintiff did not furnish any of the consideration used by defendant to acquire the stock of the corporation." It is quite impossible to believe that defendant, who knew plaintiff's full contribution and devotion to the business could have thought for a minute that she did not believe she shared his interest in the business. Certainly his conduct prior to the incorporation led her to believe that she was a partner in a joint enterprise. All the money was deposited in the account of "Mr. or Mrs. Floyd Leatherman"—not Mr. Leatherman with authority to Mrs. Leatherman to draw upon it. Further, it is of considerable significance that prior to the incorporation neither plaintiff nor defendant ever drew a salary from the business. It is partners who divide profits or reinvest their money in the business as plaintiff and defendant did. Their money went first to pay the expenses of the business, then to living expenses, and the balance remained in the joint checking account or was transferred to a joint savings account. Both were industrious and conservative. It was not until the incorporation that either drew a salary. The defendant then began to draw a salary of $20,000.00 a year but he specifically stated that it was compensation the corporation was paying for the work they both did. This post-incorporation arrangement is also significant in that it rebuts any presumption that defendant considered plaintiff's services to the bulldozer business gratuitous.

Finally we note that plaintiff assumed liability along with defendant for all the debts of the bulldozer business. From its inception, along with defendant, she signed every note for a loan from the bank, the purchase money, note and mortgage for each piece of equipment, every performance bond and, when they bought business property in Wilmington, the title to it was taken in both their names and she also signed the note and mortgage. Indubitably there is sufficient evidence in the record to support the trial judge's findings and conclusions that "the business was operated by the plaintiff and defendant" and that "the funds transferred from joint accounts to the corporate account in 1966 were the property of the plaintiff and defendant."

I would hold, therefore, that the trial judge was correct when he subjected defendant's stock in the corporation to plaintiff's claim to the extent of $16,191.01, one half of the joint checking and savings accounts. Although the trial judge ruled that defendant held the stock "subject to a constructive trust," in my view defendant holds it subject to both a resulting and constructive trust. *See Cline v. Cline,* 297 N.C. 336, 255 S.E. 2d 399 (1979). A resulting trust commensurate with plaintiff's interest arose in her favor because she furnished a part of the consideration. A constructive trust arose because the defendant breached the confidential relation, which the majority concedes existed between him and his wife, when he took title to all the stock in his name alone and told her he did so because "it would be better that way for tax purposes." Defendant's explanation—patently "a snow job"—deceived her at the time and kept her from taking any action to protect her interests in 1966. At that time relations between the partners were still amicable and she was lulled into a false sense of security by his suggestion that "some day it would all belong to her" and they would make joint wills.

Since plaintiff accepted the rulings of the trial judge which were in favor of defendant and did not appeal them, this appeal involves only plaintiff's right to one-half of the parties' joint checking and savings accounts. My vote is to reverse the Court of Appeals and affirm the judgment of the trial judge.

Justice HUSKINS joins in this dissent.